## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **ROBERT TAYLOR**, individually and on behalf of all others similarly situated,<br><br>                  Plaintiff,<br><br>v.<br><br>**YALE NEW HAVEN HEALTH SYSTEM,**<br><br>                  Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**PROPOSED CLASS ACTION** |

Plaintiff Robert Taylor, individually and on behalf of the Class defined below of similarly situated persons ("Plaintiff and Class Members"), alleges the following against Defendant Yale New Haven Health System, ("Defendant" or "YNHHS"). The following allegations are based on Plaintiff's knowledge, investigations by Plaintiff's counsel, facts of public record, and information and belief:

### NATURE OF THE ACTION

1. Plaintiff seeks to hold Defendant responsible for the injuries YNHHS inflicted on Plaintiff and over 5.5 million others due to Defendant's egregiously inadequate data security, which resulted in the private information of Plaintiff and those similarly situated to be exposed to unauthorized third parties (the "Data Breach").

2. YNHHS is a nonprofit health system that includes five hospitals, a medical foundation, various multispecialty centers and dozens of outpatient locations and ambulatory sites from New York to Rhode Island.

3.      The data that YNHHS exposed to the public is unique and highly sensitive. For one, the exposed data included personal identifying information ("PII") and protected health information ("PHI") like demographic information (such as name, date of birth, address, telephone number, email address, race or ethnicity), Social Security number, patient type, and/or medical record number (collectively "Private Information").

4.      Plaintiff and Class Members provided this information to YNHHS with the understanding YNHHS would keep that information private in accordance with both state and federal laws.

5.      On March 8, 2025, YNHHS detected unusual activity on its information technology system and was able to confirm that an authorized threat actor had accessed the Private Information of Plaintiff and Class Members. The actual Data Breach occurred on March 8, 2025.

6.      Among myriad industry standards and statutes for protection of sensitive information, PHI is specifically governed by federal law under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations. HIPAA requires entities like YNHHS  to take appropriate technical, physical, and administrative safeguards to secure the privacy of PHI, establishes national standards to protect PHI, and requires timely notice of a breach of unencrypted PHI.

7.      Instead of following these rules, however, YNHHS disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement reasonable measures to safeguard Private Information and by failing to take necessary steps to prevent unauthorized disclosure of that information. YNHHS's woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of its negligence.

8.     Exacerbating the injuries to Plaintiff and Class Members, YNHHS failed to provide timely notice to Plaintiff and Class Members, depriving them of the chance to take speedy measures to protect themselves and mitigate harm.

9.     Today, the Private Information of Plaintiff and Class Members continue to be in jeopardy because of Defendant's actions and inactions described herein. Plaintiff and Class Members now suffer from a heightened and imminent risk of fraud and identity theft for years to come and now must constantly monitor their medical and financial accounts for unauthorized activity.

10.     The PII and PHI exposed in the Data Breach can enable criminals to commit a litany of crimes. Criminals can open new financial accounts in Class Members' names, take out loans using Class Members' identities, use Class Members' names to obtain medical services, use Class Members' health information to craft phishing and other hacking attacks based on Class Members' individual health needs, use Class Members' identities to obtain government benefits, file fraudulent tax returns using Class Members' information, obtain driver's licenses in Class Members' names (but with another person's photograph), and give false information to police during an arrest.

11.     As a direct and proximate result of the Data Breach, Plaintiff and Class Members have suffered actual and present injuries, including but not limited to: (a) present, certainly impending, and continuing threats of identity theft crimes, fraud, scams, and other misuses of their Private Information; (b) diminution of value of their Private Information; (c) loss of benefit of the bargain (price premium damages); (d) loss of value of privacy and confidentiality of the stolen Private Information; (e) illegal sales of the compromised Private Information; (f) mitigation expenses and time spent responding to and remedying the effects of the Data Breach; (g) identity

theft insurance costs; (h) "out of pocket" costs incurred due to actual identity theft; (i) credit freezes/unfreezes; (j) anxiety, annoyance, and nuisance; (k) continued risk to their Private Information, which remains in YNHHS's possession and is subject to further breaches so long as YNHHS fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information; and (l) disgorgement damages associated with YNHHS's maintenance and use of Plaintiff's data for its benefit and profit.

12.    Through this action, Plaintiff seeks to remedy these injuries on behalf of himself and all similarly situated individuals whose Private Information was exposed and compromised in the Data Breach.

13.    Plaintiff brings this action against YNHHS and asserts claims for negligence, negligence per se, unjust enrichment, breach of fiduciary duty, breach of implied contract, and declaratory/injunctive relief.

## PARTIES

14.    Plaintiff Robert Taylor is a natural person, resident, and citizen of New London, Connecticut.

15.    Defendant Yale New Haven Health System is a nonprofit health system with its principal place of business located in New Haven, Connecticut.

## JURISDICTION AND VENUE

16.    This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. And minimal

diversity is established because Plaintiff (and many members of the Nationwide Class) are citizens of states different than Defendant.

17.     This Court has general personal jurisdiction over Defendant because Defendant's principal place of business and headquarters are New Haven, Connecticut. Defendant also regularly conducts substantial business in Connecticut.

18.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because substantial part of the events giving rise to the claims emanated from activities within this District, and Defendant conducts substantial business in this District.

## FACTUAL ALLEGATIONS

### Defendant Collected and Stored the Private Information of Plaintiff and Class Members

19.     YNHHS is a "a nonprofit health system that includes five acute-care hospitals, a medical foundation, several multispecialty centers and dozens of outpatient locations and ambulatory sites stretching from Westchester County, New York, to Westerly, Rhode Island."[1]

20.     Plaintiff and Class Members provided their Private Information to YNHHS as a requirement to obtain medical services from Defendant.

21.     YNHHS collects Private Information from Plaintiff and Class Members such as their demographic information (such as name, date of birth, address, telephone number, email address, race or ethnicity), Social Security number, patient type, and/or medical record number in the ordinary course of business. Upon information and belief, this Private Information is then stored on Defendant's systems.

---

[1] *Expert Care Close to Home*, YNHHS, https://www.ynhhs.org/ (last accessed Apr. 25 2025)

22.     Because of the highly sensitive and personal nature of the information YNHHS acquires and stores, YNHHS knew or reasonably should have known that it must comply with healthcare industry standards related to data security and all federal and state laws protecting Private Information and provide adequate notice if Private Information is disclosed without proper authorization.

23.     Plaintiff and Class Members provided their Private Information to YNHHS as a condition of receiving medical services from YNHHS, but in doing so, expected YNHHS to keep their Private Information confidential and securely maintained, to use this information for business and healthcare purposes only, and to make only authorized disclosures of this information.

***The Data Breach***

24.     On or about April 14, 2025, YNHHS, notified the public of the Data Breach in an online "Notice of Data Security Incident" in which YNHHS informed the public of the following:

> Yale New Haven Health ("YNHHS") is committed to providing high-quality care to all of our patients, including maintaining the privacy and security of patient information. We recently experienced a data security incident that involved some of that information. This notice provides additional information about what happened, measures we have taken in response, and offers steps patients may consider taking.

> **What Happened?** On March 8, 2025, we identified unusual activity affecting our Information Technology (IT) systems. We immediately took steps to contain the incident and began an investigation, which included assistance from external cybersecurity experts. We also reported the incident to law enforcement. The investigation determined that an unauthorized third-party gained access to our network and, on March 8, 2025, obtained copies of certain data.

> At no point did this incident impact our ability to provide patient care.

> **What Information Was Involved?** The information involved varied by patient, but may have included demographic information (such as name, date of birth,

address, telephone number, email address, race or ethnicity), Social Security number, patient type, and/or medical record number.

YNHHS' electronic medical record and treatment information were **not** involved or accessed, and no financial account or payment information was involved in this incident.

**What YNHHS Is Doing & What Patients Can Do.** YNHHS considers the health, safety, and privacy of patients our top priority. We are continuously updating and enhancing our systems to protect the data we maintain and to help prevent events such as this from occurring in the future.

Beginning on April 14th, we are mailing letters to patients whose information was involved. While, to date, YNHHS is not aware of any patient information being used for identity theft or fraud, as a precaution, we are offering complimentary credit monitoring and identity protection services to individuals whose Social Security number was involved. Patients are also encouraged to review statements they receive from their healthcare providers and immediately report any inaccuracies to the provider.

YNHHS has established a dedicated, toll-free call center that individuals may contact with questions about this incident. The call center is available at 1-855-549-2678, Monday through Friday, 9 am to 9 pm Eastern Time, excluding major U.S. holidays.

We take our responsibility to safeguard patient information incredibly seriously, and we deeply regret any concern this incident may have caused.[2]

25.     Upon information and belief, Plaintiff's and Class Members' affected Private Information at the time of the Data Breach was accessible, unencrypted, unprotected, and vulnerable for acquisition and/or exfiltration by unauthorized individuals.

26.     Upon information and belief, YNHHS was a target due to its status as healthcare entity that collects, creates, and maintains Private Information.

---

[2] *Notice of Data Security Incident*, YNHHS, https://www.ynhhs.org/legal-notices (last accessed Apr. 25, 2025)

27.     The Notice of Data Security Incident gives no details to Plaintiff or Class Members regarding the manner and means of how their Private Information was disclosed and leaves Plaintiff and Class Members wondering how they can protect themselves.

28.     Time is of the essence when highly sensitive Private Information is subject to unauthorized access and/or acquisition. The disclosed, accessed, and/or acquired Private Information of Plaintiff and Class Members is now likely available on the Dark Web. Hackers can access and then offer for sale the unencrypted, unredacted Private Information to criminals.

29.     Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the possible publication of their Private Information, especially their Social Security numbers and sensitive medical information, onto the Dark Web. Plaintiff and Class Members face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing hundreds of thousands of Social Security numbers and/or specific, sensitive medical information.

30.     YNHHS largely put the burden on Plaintiff and Class Members to take measures to protect themselves from identity theft and fraud.

31.     Seemingly YNHHS plans to offer at least some of those impacted by the Data Breach credit monitoring services. Such measures, however, are insufficient to protect Plaintiff and Class Members from the lifetime risks they each now face. As another element of damages, Plaintiff and Class Members seek a sum of money sufficient to provide to Plaintiff and Class Members identity theft protection services for their respective lifetimes.

32.     Plaintiff and the Class Members remain in the dark regarding exactly what data was stolen, the particular method of disclosure, the results of any investigations, and what steps

are being taken, if any, to secure their Private Information going forward. Plaintiff and Class Members are left to speculate as to the full impact of the Data Breach and how exactly Defendant intends to enhance its information security systems and monitoring capabilities so as to prevent further breaches.

33.     YNHHS could have prevented the Data Breach by properly securing and encrypting and/or more securely encrypting its servers and systems, generally, as well as Plaintiff's and Class Members' Private Information.

34.     Defendant's negligence in safeguarding Plaintiff's and Class Members' PII and PHI was exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.

35.     Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.6% of U.S.-based workers are compensated on an hourly basis, while the other 44.4% are salaried.[3]

36.     According to the American Time Use Survey, American adults have between 4 to 6 hours of "leisure time" outside of work per day;[4] examples of leisure time include partaking in sports, exercise and recreation; socializing and communicating; watching TV; reading; thinking/relaxing; playing games and computer use for leisure; and other leisure activities.[5] Usually, this time can be spent at the option and choice of the consumer, however, having been

---

[3] *Characteristics of minimum wage workers, 2022*, U.S. Bureau of Labor Statistics (Aug. 2023), https://www.bls.gov/opub/reports/minimum-wage/2022/home.htm (last accessed on Aug. 6, 2024).
[4] *Americans have no idea how to use their free time*, Business Insider (Mar. 26, 2024), https://www.businessinsider.com/americans-free-time-leisure-dont-use-television-2024-3 (last accessed on Aug. 6, 2024).
[5] *Table 11A. Time spent in leisure and sports activities for the civilian population by selected characteristics, averages per day, 2022 annual averages*, U.S. Bureau of Labor Statistics (June 22, 2023), https://www.bls.gov/news.release/atus.t11A.htm (last accessed on Aug. 6, 2024).

notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

37.     Plaintiff and Class Members are deprived of the choice as to how to spend their valuable free hours and therefore seek renumeration for the loss of valuable time as another element of damages.

***Healthcare Organizations Are a Prime Target for Cybercriminals***

38.     Healthcare organizations have become a main target for cybercriminals because they "hold a massive amount of patient data — including medical records, financial information, Social Security numbers, names and addresses. They're also among the few businesses that stay open 24/7, meaning they might be more likely to prioritize avoiding disruptions and, therefore, more likely to pay a hacker's ransom."[6]

39.     In the context of data breaches, healthcare is "by far the most affected industry sector."[7] Further, cybersecurity breaches in the healthcare industry are particularly devastating, given the frequency of such breaches and the fact that healthcare providers maintain highly sensitive and detailed PII.[8]

40.     Despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect Plaintiff's and Class Members' Private Information from being compromised.

---

[6] Elise Takahama, *Why health care has become a top target for cybercriminals*, The Seattle Times (Feb. 25, 2024), https://www.seattletimes.com/seattle-news/health/why-health-care-has-become-a-top-target-for-cybercriminals/ (last accessed on Aug. 6, 2024).
[7] Tenable Security Response Team, *Healthcare Sec.*, TENABLE (Mar. 10, 2021), https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches (last accessed on Aug. 6, 2024).
[8] *See id*.

41.     YNHHS failed to properly train its employees as to cybersecurity best practices and to maintain proper staffing and processes for responding to and preventing network intrusions.

42.     YNHHS failed to implement sufficient processes to quickly detect and respond to data breaches, security incidents, or intrusions.

43.     YNHHS failed to encrypt Plaintiff's and Class Members' Private Information and monitor user behavior and activity to identify possible threats.

44.     YNHHS failed to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

45.     YNHHS failed to timely and accurately disclose that Plaintiff's and Class Members' PII and PHI had been improperly acquired or accessed.

46.     YNHHS knowingly disregarded standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII and PHI.

***Defendant Failed to Comply with FTC Guidelines***

47.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[9] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII and PHI.

48.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[10] The guidelines explain that businesses should:

---

[9] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf. (last accessed on Aug. 6, 2024).

[10] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://bit.ly/3u9mzre (last accessed on Aug. 6, 2024).

a.      protect the personal customer information that they keep;

b.      properly dispose of personal information that is no longer needed;

c.      encrypt information stored on computer networks;

d.      understand their network's vulnerabilities; and

e.      implement policies to correct security problems.

49.     The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

50.     The FTC recommends that companies not maintain PII and PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[11]

51.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

52.     These FTC enforcement actions include actions against healthcare providers and partners like Defendant. *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that

---

[11] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf (last accessed on Aug. 6, 2024).

LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

53.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

54.    Despite its alleged commitments to securing sensitive data, YNHHS does not follow industry standard practices in securing Private Information.

55.    As shown above, experts studying cyber security routinely identify healthcare related entities as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

56.    Several best practices have been identified that at a minimum should be implemented by healthcare entities like Defendant, including but not limited to, educating all employees on the risks of cyber attacks; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

57.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

58.    Upon information and belief, YNHHS failed to meet the minimum standards of any

of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

59.     Such frameworks are the existing and applicable industry standards in the healthcare industry. And YNHHS failed to comply with these accepted standards, thus opening the door to criminals and the Data Breach.

***Defendant Violated HIPAA and HITECH***

60.     HIPAA circumscribes security provisions and data privacy responsibilities designed to keep medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[12]

61.     HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained.[13]

62.     The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

---

[12] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[13] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

a.    Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b.    Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c.    Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d.    Failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.    Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.    Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.   Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.   Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

63.   Defendant acknowledges in its "Notice of Privacy Practices" that the Private Information collected by Defendant is subject to HIPAA's requirements:

> We work hard to ensure the privacy of patients and maintain the confidentiality their information and medical records. Like all accredited healthcare institutions, we follow a federal law called the Health Insurance Portability and Accountability Act (HIPAA), which is designed to protect the privacy and confidentiality of patient information. We insist that our staff observe patient confidentiality – respecting your right to privacy about your medical records and experience at our hospital.
>
> [...]
>
> This notice describes how medical information about you may be used and disclosed and how you can get access to this information. Please review it carefully. If you have any questions, please contact our privacy office at the phone number at the bottom of this notice.
>
> **Our pledge to you**:
> We understand that medical information about you is personal. We are committed to protecting medical information about you. We create a record of the care and services you receive to provide quality care and to comply with legal requirements. This notice applies to all of the records of your care generated by any of the separate facilities and providers described below. We are required by law to:
>
> • Keep medical information about you private;
> • Give you this notice of our legal duties and privacy practices with respect to medical information about you; and
> • Follow the terms of the notice that is currently in effect.
>
> [...]

16

**Who will follow this notice?**

Yale New Haven Health System (YNHHS) and Yale School of Medicine (YSM) facilities provide health care to our patients in partnership with other professionals and healthcare organizations. The information privacy practices in this notice will be followed by:

- Any healthcare professional who treats you at any of our locations
- All departments and affiliated covered entities of Yale New Haven Health System, including; Bridgeport Hospital, Greenwich Hospital, Northeast Medical Group, Westerly Hospital, Lawrence + Memorial Hospital and Yale New Haven Hospital
- Yale School of Medicine
- The clinical care providers of Yale School of Nursing as well as their affiliates
- All employees, medical staff, affiliates, trainees, students, or volunteers of the entities listed above.[14]

64.     Defendant also represents the following in a section of its website about the "Data Security and Retention" of Plaintiff's and Class Members' Private Information:

YNHHS follows all applicable laws governing the retention of your data. Factors that influence the length of time that we retain your data include: the information needed to provide products, services, and experiences to you; the data needed to manage your account, ensure secure payment, and contact you; and, finally, the data needed to serve any advertising based on personal interests and preferences.

YNHHS makes every reasonable effort to ensure that all of the transactions that occur on our websites are secure. We use a secure firewall and a security infrastructure that protects the integrity and privacy of personal information submitted to us via this website. We store all data with Secure Socket Layer (SSL) encryption to protect information you may submit on our Sites. SSL is the industry standard protocol. All off-line information is securely stored and is accessible only by authorized staff. That being said, YNHHS cannot ensure or warrant the security of any information you transmit to us, and you do so at your own risk. We have taken reasonable steps to ensure the integrity and confidentiality of personal data that you may provide. You should understand, however, that electronic transmissions via the internet are not necessarily secure from interception, and so we cannot absolutely guarantee the security or confidentiality of such transmissions.[15]

---

[14] *Notice of Privacy Practices*, YNHHS (last updated Sept. 10, 2019), https://www.ynhhs.org/policies (last accessed Apr. 25, 2025)

[15] *Online Privacy Policies*, YNHHS, https://www.ynhhs.org/policies/online-privacy (last accessed Apr. 25, 2025)

65.    Defendant thus agrees that it will comply with HIPAA. The Data Breach, however, which resulted from a combination of insufficiencies, demonstrates that Defendant indeed failed to comply with safeguards mandated by HIPAA regulations.

66.    YNHHS is also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

67.    Both HIPAA and HITECH obligate YNHHS to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of sensitive Private Information. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. § 17902.

***Plaintiff's Experiences and Injuries Caused by the Data Breach***

68.    Plaintiff and Class Members are current and former patients of affiliated covered entities of YNHHS.

69.    As a prerequisite of being able to obtain medical care from YNHHS, Defendant required Plaintiff and Class Members to provide their Private Information.

70.    YNHHS began notifying Plaintiff and Class Members about the Data Breach on or around April 14, 2025.

71.    When YNHHS finally announced the Data Breach, it deliberately underplayed the severity and obfuscated the nature of the Data Breach. Defendant's Data Breach notice fails to adequately explain how the breach occurred, what exact data elements of each affected individual were compromised, and the extent to which those data elements were compromised.

72.     Because of the Data Breach, Defendant inflicted injuries upon Plaintiff and Class Members. And yet, Defendant has done little to provide Plaintiff and the Class Members with relief for the damages they suffered.

**A.  Plaintiff Robert Taylor**

73.     Plaintiff Robert Taylor is an adult individual and a natural person of Connecticut, residing in New London, where he intends to stay.

74.     On or about April 2024, Plaintiff went to "Lawrence + Memorial Hospital," an affiliated covered entity of Defendant, for medical care.

75.     YNHHS obtained Plaintiff's information as a prerequisite for Plaintiff to obtain medical care from YNHHS. YNHHS collects and maintains personal and sensitive information of its patients, such as Plaintiff, in order to provide medical care.

76.     Plaintiff received from YNHHS a Data Breach notice letter, dated April 14, 2025. This notice received by Plaintiff is substantively similar to the online breach notice posted on YNHHS's website.

77.     The paper Data Breach notice letter informed Plaintiff that the following data types of his were compromised in the Data Breach: demographic information (such as name, date of birth, address, telephone number, email address, race or ethnicity), and/or medical record number.

78.     In the paper Data Breach notice letter, YNHHS claims that the following data types were not affected: Social Security number, electronic medical record and treatment information, and financial account or payment information.

79.     Plaintiff is a reasonably cautious person and is therefore careful about sharing his sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff stores any documents

containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure his information is as protected as it can be. When it is available to him Plaintiff uses two-factor or multifactor authentication to add an extra layer of security to his Private Information.

80.    Plaintiff only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Defendant at the time of the Data Breach.

81.    In the instant that his Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

82.    As a result of the Data Breach, Plaintiff has been unable to have his loan requests processed through his account with Affirm, a financial technology company that offers "buy now, pay later" loans to account holders.

83.    Plaintiff has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, and exfiltrated by cybercriminals

84.    Furthermore, Plaintiff has experienced a dramatic increase in the amount of spam he has been receiving as a result of the Data Breach, including the following text messages from phone numbers not listed in Plaintiff's cell phone contacts:

    a.   On March 21, 2025, an unknown individual simply texted Plaintiff, "How have you been? [emoticons displaying hearts]"

    b.   On March 29, 2025, someone claiming to be "Matthew" asked if Plaintiff had "a few minutes" to discuss a potential job role that Plaintiff did not apply for.

85.    The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

86.    After being notified about the Data Breach, Plaintiff pulled his updated credit report from Experian, which reported false credit applications under Plaintiff's name. As a result, during April 2025, Plaintiff imposed a credit freeze through his Experian consumer credit account, the freeze of which remains in place.

87.    As a result of the actual harm he has suffered and the increased imminent risk of future harm, Plaintiff spends approximately ten (10) hours since the Data Breach assessing whether text messages, emails and phone calls are spam, combing through his financial accounts and records, billing statements, and consumer credit accounts to stay vigilant against potential fraud or identity theft. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

88.    The substantial risk of imminent harm and loss of privacy have caused Plaintiff to suffer stress, fear, and anxiety. Plaintiff has a continuing interest in ensuring that Plaintiff's Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

***Plaintiff and the Class Face Significant Risk of Present and Continuing Identity Theft***

89.     Plaintiff and Class Members suffered injury from the misuse of their PII and PHI that can be directly traced to Defendant.

90.     The ramifications of Defendant's failure to keep Plaintiff's and the Class's PII and PHI secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

91.     In 2021, 32% of persons aged 16 or older who received breach notification were victims of multiple types of identity theft.[16]

92.     As a result of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiff and Class Members suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

   a.     The loss of the opportunity to control how their PII and PHI is used;

   b.     The diminution in value of their PII and PHI;

   c.     The compromise and continuing publication of their PII and PHI;

   d.     Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

   e.     Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future

---

[16] Erika Harrell, PhD, *Data Breach Notifications and Identity Theft, 2021*, U.S. Bureau of Justice Statistics (Jan. 2024), https://bjs.ojp.gov/data-breach-notifications-and-identity-theft-2021. (last accessed on Aug. 6, 2024).

consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.     Delay in receipt of tax refund monies;

g.     Unauthorized use of stolen PII and PHI; and

h.     The continued risk to their PII and PHI, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII and PHI in their possession.

93.     Stolen PII and PHI is one of the most valuable commodities on the criminal information black market. According to Prey, a company that develops device tracking and recovery software, stolen PII and PHI can be worth up to $2,000.00 depending on the type of information obtained.[17]

94.     The value of Plaintiff's and the Class's Private Information on the black market is considerable. Stolen PII and PHI trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

95.     It can take victims years to spot or identify PII and PHI theft, giving criminals plenty of time to milk that information for cash.

---

[17] Juan Hernandez, *The Lifecycle of Stolen Credentials on the Dark Web*, Prey (Feb. 26, 2024), https://preyproject.com/blog/lifecycle-stolen-credentials-dark-web (last accessed on Aug. 6, 2024).

96.     One such example of criminals using PII and PHI for profit is the development of "Fullz" packages.[18]

97.     Cyber-criminals can cross-reference two sources of PII and PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

98.     The development of "Fullz" packages means that stolen PII and PHI from the Data Breach can easily be used to link and identify it to Plaintiff and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII and PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII and PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

---

[18] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Sec. (Sep. 18, 2014), https://krebsonsecurity.com/tag/fullz/ (last accessed on Aug. 6, 2024).

99.    According to the FBI's Internet Crime Complaint Center (IC3) 2023 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $12.5 billion in losses to individuals and business victims.[19]

100.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

101.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PII and PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

102.    The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[20]

103.    The FTC has issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data

---

[19] *2023 Internet Crime Report*, Fed. Bureau of Investig. (2023), https://www.ic3.gov/Media/PDF/AnnualReport/2023_IC3Report.pdf (last accessed on Aug. 6, 2024).
[20] *Commissioner Pamela Jones Harbour: Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMMISSION (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last accessed on Aug. 6, 2024).

security into all business decision-making.[21] According to the FTC, data security requires: (1) controlling access to data sensibly; (2) requiring secure passwords and authentication; (3) storing sensitive information securely and protecting it during transmission; (4) segmenting networks and monitoring who is trying to get in and out; (5) securing remote access to networks; (6) applying sound security practices when developing new products; (7) ensuring that third-party service providers implement reasonable security measures; (8) putting in place procedures to keep security current and address potential vulnerabilities; and (9) securing paper, physical media, and devices.[22]

104.    According to the FTC, unauthorized PII and PHI disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money, and patience to resolve the fallout.[23] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTCA.

105.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ¶ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ¶ 7 (Mar. 7, 2006) ("[Defendant] failed to employ

---

[21]*Start With Security, A Guide for Business*, Fed. Trade Comm'n (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf. (last accessed on Aug. 6, 2024).
[22]*Id.*

[23] *See Taking Charge, What to Do If Your Identity is Stolen*, FED. TRADE COMM'N, at 3 (Jan. 2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last accessed on Aug. 26, 2024).

sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations. Defendant thus knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of PII and PHI.

106.    Healthcare organizations have become a main target for cybercriminals because they "hold a massive amount of patient data — including medical records, financial information, Social Security numbers, names and addresses. They're also among the few businesses that stay open 24/7, meaning they might be more likely to prioritize avoiding disruptions and, therefore, more likely to pay a hacker's ransom."[24]

107.    Charged with handling highly sensitive PII and PHI including healthcare information, financial information, and insurance information, Defendant knew or should have known the importance of safeguarding the PII and PHI that was entrusted to it. Defendant also knew or should have known of the foreseeable consequences if its data security systems were

---

[24] Elise Takahama, *Why health care has become a top target for cybercriminals*, The Seattle Times (Feb. 25, 2024), https://www.seattletimes.com/seattle-news/health/why-health-care-has-become-a-top-target-for-cybercriminals/ (last accessed on Aug. 6, 2024).

breached. Defendant nevertheless failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

108.    Defendant's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has exposed the PII and PHI of Plaintiff and over 5.5 million members of the proposed Class to unscrupulous operators, con artists, and outright criminals.

## CLASS ACTION ALLEGATIONS

109.    Plaintiff brings this class action individually and on behalf of all similarly situated persons under Federal Rule of Civil Procedure 23. Plaintiff seeks certification under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) of the following Nationwide Class (the "Class"):

> All persons in the United States whose Private Information was compromised in the Defendant's Data Breach which occurred on March 8, 2025.

110.    The Class defined above is readily ascertainable from information in Defendant's possession. Thus, such identification of Class Members will be reliable and administratively feasible.

111.    Excluded from the Class are: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or their parent has a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and

Defendant's counsel; (6) members of the jury; and (7) the legal representatives, successors, and assigns of any such excluded persons.

112.    Plaintiff reserves the right to amend or modify the Class definitions as this case progresses.

113.    Plaintiff satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

114.    **Numerosity**. Class Members are numerous such that joinder is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of the approximately 5.5 million individuals whose PII and PHI were compromised by Defendant's Data Breach.

115.    **Commonality**. There are many questions of law and fact common to the Class. And these common questions predominate over any individualized questions of individual Class Members. These common questions of law and fact include, without limitation:

  a.    If Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII and PHI;

  b.    If Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

  c.    If Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, HIPAA;

  d.    If Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.      If Defendant owed a duty to Class Members to safeguard their PII and PHI;

f.      If Defendant breached its duty to Class Members to safeguard their PII and PHI;

g.      If Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.      If Defendant should have discovered the Data Breach earlier;

i.      If Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

j.      If Defendant's delay in informing Plaintiff and Class Members of the Data Breach was unreasonable;

k.      If Defendant's method of informing Plaintiff and Class Members of the Data Breach was unreasonable;

l.      If Defendant's conduct was negligent;

m.      If Plaintiff and Class Members were injured as a proximate cause or result of the Data Breach;

n.      If Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

o.      If Defendant breached implied contracts with Plaintiff and Class Members;

p.      If Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

q.      If Defendant failed to provide notice of the Data Breach in a timely manner, and;

r.       If Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

116.    **Typicality**. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach. Moreover, Plaintiff and Class Members were subjected to Defendant's uniformly illegal and impermissible conduct.

117.    **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's counsel is competent and experienced in litigating complex class actions. Plaintiff has no interests that conflict with, or are antagonistic to, those of the Class.

118.    **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff's and Class Members' data was stored on the same computer system and unlawfully exposed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

119.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for

Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources, the parties' resources, and protects the rights of each Class Member.

120.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

121.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

122.    Likewise, particular issues under Federal Rule of Civil Procedure 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include those set forth above.

123.    Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## CLAIMS FOR RELIEF

### I.    FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiff and the Nationwide Class)**

124.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 123 of the Complaint as if fully set forth herein.

125.    Defendant required Plaintiff and Class Members to provide Defendant with Private Information in order to receive Defendant's products and services.

32

126.     By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard their computer system—and Plaintiff's and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes so they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

127.     The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendant holds vast amounts of PII and PHI, it was inevitable that unauthorized individuals would at some point try to access Defendant's databases of PII and PHI.

128.     After all, Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII and PHI of Plaintiff and Class Members. Thus, Defendant knew, or should have known, the importance of exercising reasonable care in handling the PII and PHI entrusted to it.

129.     Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII and PHI.

130.     Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and Class Members, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law.

Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

131.    Defendant failed to take appropriate measures to protect the PII and PHI of Plaintiff and the Class. Defendant is morally culpable, given the prominence of security breaches in the healthcare industry. Any purported safeguards that Defendant had in place were wholly inadequate.

132.    Defendant breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class Members' PII and PHI by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite known data breaches in the healthcare industry, and allowing unauthorized access to Plaintiff's and the other Class Members' PII and PHI.

133.    The failure of Defendant to comply with industry and federal regulations evinces Defendant's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI.

134.    But for Defendant's wrongful and negligent breach of their duties to Plaintiff and the Class, Private Information would not have been compromised, stolen, and viewed by unauthorized persons. Defendant's negligence was a direct and legal cause of the theft of the PII and PHI of Plaintiff and the Class and all resulting damages.

135.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class members' PII and PHI. Defendant knew or should have known that its systems and technologies for processing and securing the PII and PHI of Plaintiff and the Class had security vulnerabilities.

136.    As a result of this misconduct by Defendant, the PII, PHI, and other sensitive information of Plaintiff and the Classes was compromised, placing them at a greater risk of identity theft and their PII and PHI being disclosed to third parties without the consent of Plaintiff and the Class.

137.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised Private Information; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information; (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII/PHI for the rest of their lives; (viii) the present value of ongoing credit monitoring and identity defense services necessitated by Defendant's data breach; (ix) the value of the unauthorized access to their PII/PHI permitted by Defendant; and (x) any nominal damages that may be awarded.

138.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses including nominal damages.

139.    Defendant's negligent conduct is ongoing, in that it still possesses Plaintiff's and Class Members' Private Information in an unsafe and insecure manner.

140.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## II.    SECOND CAUSE OF ACTION
### Negligence *Per Se*
#### (On Behalf of Plaintiff and the Nationwide Class)

141.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 123 of the Complaint as if fully set forth herein.

142.    Defendant had duties arising under HIPAA (including the Privacy Rule and Security Rule), HITECH, and the FTCA to protect Plaintiff's and Class Members' Private Information.

143.    Defendant breached its duties, pursuant to the FTCA and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following: (i) failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information; (ii) failing to adequately monitor the security of its networks and systems; (iii) allowing unauthorized access to Class Members' Private Information; (iv) failing to detect in a timely manner that Class Members' Private Information had been compromised; (v) failing to remove Private Information it was no longer required to retain pursuant to regulations; and (vi) failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

144.    Defendant's violation of HIPAA, HITECH, and Section 5 of the FTCA (and similar state statutes) constitutes negligence *per se*.

145.    Plaintiff and Class Members are consumers within the class of persons that HIPAA, HITECH, and Section 5 of the FTCA were intended to protect.

146.    The harm that has occurred is the type of harm HIPAA, HITECH, and the FTCA were intended to guard against.

147.    The FTC has pursued enforcement actions against businesses and healthcare entities that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

148.    Defendant breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

149.    Plaintiff and Class Members were foreseeable victims of Defendant's violations of HIPAA, HITECH, and the FTCA. Defendant knew or should have known that its failure to implement reasonable data security measures to protect and safeguard Plaintiff's and Class Members' Private Information would cause damage to Plaintiff and the Class.

150.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised Private Information; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b)

37

remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

151.    As a direct and proximate result of Defendant's negligence *per se* Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

152.    Finally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

153.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

### III.    THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class)**

154.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 123 of the Complaint as if fully set forth herein.

155.    Plaintiff and Class Members conferred a benefit on Defendant by entrusting their Private Information to YNHHS from which YNHHS derived profits.

156.    Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and PHI. Instead of

providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide adequate security.

157.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

158.    Defendant acquired the PII and PHI through inequitable means in that Defendant failed to disclose the inadequate security practices, previously alleged, and failed to maintain adequate data security.

159.    If Plaintiff and Class Members knew that Defendant had not secured their PII and PHI, they would not have agreed to disclose their data to Defendant.

160.    Plaintiff and Class Members have no adequate remedy at law.

161.    As a direct and direct an proximate result of YNHHS's conduct, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised Private Information; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in YNHHS's possession and is subject to further unauthorized disclosures or

further entrustment to inadequate third party vendors so long as YNHHS fails to undertake appropriate and adequate measures to protect the Private Information; (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII/PHI for the rest of their lives; (viii) the present value of ongoing credit monitoring and identity defense services necessitated by YNHHS's data breach; (ix) the value of the unauthorized access to their PII/PHI permitted by Defendant; and (x) any nominal damages that may be awarded.

162.    Plaintiff and Class Members are entitled to restitution and/or damages from YNHHS and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by YNHHS from its wrongful conduct, as well as return of their sensitive Private Information and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

163.    Plaintiff and Class Members may not have an adequate remedy at law against YNHHS, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

### IV.    FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Nationwide Class)

164.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 123 of the Complaint as if fully set forth herein.

165.    A relationship existed between Plaintiff, the Class Members, and Defendant, which arose from Defendant's acceptance of Plaintiff's and the Class Members' PII and PHI and Defendant's representations of its commitment to protect said PII and PHI.

40

166.    YNHHS became the guardian of Plaintiff's and Class Members' Private Information. YNHHS became a fiduciary, created by its undertaking and guardianship of Plaintiff's and Class Members' Private Information, to act primarily for their benefit. This duty included the obligation to safeguard Plaintiff's and Class Members' Private Information and to timely detect and notify Plaintiff and Class Members in the event of a data breach.

167.    The interests of public policy mandates that a fiduciary duty is imputed given Defendant's acceptance of Plaintiff's and the Class Members' Private Information and Defendant's representations of its commitment to protect said Private Information.

168.    Defendant breached the fiduciary duty that it owed to Plaintiff and Class Members because Defendant failed to act with the utmost good faith, fairness, honesty, the highest degree of loyalty, ultimately failed to protect the Private Information of Plaintiff and Class Members.

169.    Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiff and Class Members.

170.    But for Defendant's breach of fiduciary duty, the damage to Plaintiff and Class Members would not have occurred.

171.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class Members.

172.    As a direct and proximate result YNHHS's breaches of its fiduciary duties, Plaintiff and Class Members have suffered or will suffer concrete injury, including, but not limited to: (a) actual identity theft; (b) the loss of the opportunity to determine how and when their Private Information is used; (c) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft

41

and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in YNHHS's possession and is subject to further unauthorized disclosures so long as YNHHS fails to undertake appropriate and adequate measures to protect Private Information in its continued possession and ensure that it retains vendors who adequately protect Private Information; (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, and repair the impact of the Private Information compromised as a direct and traceable result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (h) nominal damages.

173.    As a direct and proximate result of YNHHS breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## V.    FIFTH CAUSE OF ACTION
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Nationwide Class)

174.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 123 of the Complaint as if fully set forth herein.

175.    Through their course of conduct, Defendant, Plaintiff, and Class Members entered into contracts for the provision of medical care, as well as implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' Private Information.

176.    Specifically, Plaintiff and Class Members entered into valid and enforceable implied contracts with Defendant when they first applied for or obtained medical care from YNHHS.

177.    The valid and enforceable implied contracts to provide medical care that Plaintiff and Class Members entered into with Defendant include the promise to protect non-public Private Information given to Defendant or that Defendant creates on its own from disclosure.

178.    When Plaintiff and Class Members provided their Private Information to Defendant in exchange for medical care, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

179.    Defendant solicited and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

180.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

181.    Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security.  Defendant failed to do so.

182.    Under the implied contracts, Defendant promised and was obligated to: (a) provide medical care to Plaintiff and Class Members; and (b) protect Plaintiff's and the Class Members' PII/PHI: provided to obtain such healthcare services; and/or created as a result of providing such services. In exchange, Plaintiff and Members of the Class agreed to pay money for these medical services, and to turn over their Private Information.

183.    Both the provision of medical care and the protection of Plaintiff's and Class Members' Private Information were material aspects of these implied contracts.

184.    The implied contracts for the provision of medical care —contracts that include the contractual obligations to maintain the privacy of Plaintiff's and Class Members' Private Information—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's online privacy policies.

185.    Defendant's express representations memorialize and embody the implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' Private Information.

186.    Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with obtaining healthcare private. To Plaintiff and Class Members, healthcare services that do not adhere to industry standard data security protocols to protect Private Information is fundamentally less useful and less valuable than healthcare that adheres to industry-standard data security. Plaintiff and Class Members would not have entrusted their Private Information to Defendant and/or its customers and entered into these implied contracts with Defendant without an understanding that their Private Information would be safeguarded and protected or entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

187.    A meeting of the minds occurred, as Plaintiff and Members of the Class agreed to and did provide their Private Information to Defendant, and paid for the provided services in exchange for, amongst other things, both the provision of healthcare services and the protection of their Private Information.

188.    Plaintiff and Class Members performed their obligations under the contract when they paid for their medical care and provided their Private Information.

189.    Defendant materially breached its contractual obligation to protect the non-public Private Information Defendant gathered when the sensitive information was accessed by unauthorized personnel as part of the Data Breach.

190.    Defendant materially breached the terms of the implied contracts. Defendant did not maintain the privacy of Plaintiff's and Class Members' Private Information as evidenced by its notifications of the Data Breach to Plaintiff and approximately 5.5 million Class Members. Specifically, Defendant did not comply with industry standards, standards of conduct embodied in statutes like HIPAA and Section 5 of the FTCA or otherwise protect Plaintiff's and the Class Members' Private Information, as set forth above.

191.    The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

192.    As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Members of the Class did not receive the full benefit of the bargain and, instead, received medical services that were of a diminished value to that described in the contracts. Plaintiff and Class Members therefore were damaged in an amount at least equal to the difference in the value of the medical services with data security protection they paid for and the medical services they received.

193.    Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, the Class Members, nor any reasonable person would have paid money to Defendant for medical care.

194.     As a direct and proximate result of the Data Breach, Plaintiff and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, disruption of their medical care, out-of-pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

195.     Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

196.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit and identity monitoring to all Class Members.

### VI.     SIXTH CAUSE OF ACTION
### Declaratory Judgment/Injunctive Relief
### (On Behalf of Plaintiff and the Nationwide Class)

197.     Plaintiff re-alleges and incorporates by reference paragraphs 1 to 123 of the Complaint as if fully set forth herein.

198.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

199.     An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' Private Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further

data breaches that compromise their Private Information. Plaintiff alleges that Defendant's data security measures remain inadequate.

200.    Defendant's cybersecurity incident demonstrates the need for injunctive relief for Plaintiff and Class Members. Defendant has not implemented measures to protect Private Information, leaving Plaintiff and Class Members without a way of protecting themselves.

201.    Plaintiff and Class Members continue to suffer injuries as result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

202.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following: (a) Defendant owes a legal duty to secure Plaintiff's and Class Members' Private Information, and to timely notify impacted individuals of a data breach under the common law, Section 5 of the FTCA, HIPAA, and various state statutes, and (b) Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

      a.    Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

      b.    Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security and monitoring measures, including, but not limited to:

            i.    prohibiting Defendant from engaging in the wrongful and unlawful acts alleged herein;

            ii.    requiring Defendant to protect, including through encryption, all data collected through the course of business in accordance with all applicable

47

regulations, industry standards, and federal, state or local laws;

      iii.    requiring Defendant to delete and purge the Private Information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

      iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' Private Information;

      v.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

      vi.    prohibiting Defendant from maintaining Plaintiff's and Class Members' Private Information on a cloud-based database until proper safeguards and processes are implemented;

      vii.    requiring Defendant to segment data by creating firewalls and access controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

      viii.    requiring Defendant to conduct regular database scanning and securing checks;

      ix.    requiring Defendant to monitor ingress and egress of all network traffic;

      x.    requiring Defendant to establish an information security training program that includes at least annual information security training for all

employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiff and Class Members;

xi.      requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xii.     requiring Defendant to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendant's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xiii.    requiring Defendant to meaningfully educate all Class Members about the threats that it faces because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

203.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at, or implicating, Defendant. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

204.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds

the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

205.    Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, on behalf of himself and all others similarly situated, request the following relief:

A.    An Order certifying this action as a class action and appointing Plaintiff as the Class Representative;

B.    A mandatory injunction directing Defendant to adequately safeguard the PII and PHI of Plaintiff and the Class hereinafter by implementing improved security procedures and measures, including but not limited to an Order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendant to delete and purge the PII and PHI of Plaintiff and Class Members unless Defendant can provide to the Court reasonable

justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII and PHI;

v.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

vi.   prohibiting Defendant from maintaining Plaintiff's and Class Members' PII and PHI on a cloud-based database until proper safeguards and processes are implemented;

vii.   requiring Defendant to segment data by creating firewalls and access controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

viii.   requiring Defendant to conduct regular database scanning and securing checks;

ix.   requiring Defendant to monitor ingress and egress of all network traffic;

x.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII and PHI, as well as protecting the PII and PHI of Plaintiff and Class Members;

xi.   requiring Defendant to implement a system of tests to assess their respective

employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

    xii.   requiring Defendant to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendant's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

    xiii.   requiring Defendant to meaningfully educate all Class Members about the threats that they face because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

C.    A mandatory injunction requiring that Defendant provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of PII and PHI to unauthorized persons;

D.    Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen PII and PHI;

E.    An award of damages, including actual, nominal, consequential damages, and punitive, as allowed by law in an amount to be determined;

F.    An award of litigation expenses, as allowed by law;

G.    An award of pre- and post-judgment interest, as permitted by law;

H.    Granting the Plaintiff and the Class leave to amend this Complaint to conform to the evidence produced at trial;

I.      For all other Orders, findings, and determinations identified and sought in this

        Complaint; and

J.      Such other and further relief as this court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury for any and all issues in this action so triable as of right.


Dated: April 25, 2025              Respectfully Submitted,


                                   _/s/    William M. Brown, Jr._

                                   William M. Brown, Jr.
                                   (D. Conn. # 20813)
                                   William.brown@forthepeople.com
                                   MORGAN & MORGAN, P.A.
                                   199 Walter St., Suite 1500
                                   New York, NY 10038
                                   T: (917) 344-7039

                                   JOHN A. YANCHUNIS*
                                   jyanchunis@forthepeople.com
                                   RONALD PODOLNY*
                                   ronald.podolny@forthepeople.com
                                   ANTONIO ARZOLA, JR.*
                                   ararzola@forthepeople.com
                                   **MORGAN & MORGAN**
                                   **COMPLEX LITIGATION GROUP**
                                   201 N. Franklin Street, 7th Floor
                                   Tampa, Florida 33602
                                   Phone: (813) 275-5272
                                   Fax: (813) 222-4736

***Pro hac vice forthcoming.**

**Counsel for Plaintiff and the Class**